STATE OF NORTH CAROLINA v. HARVEY LEE GREEN, JR.

No. 385A84-3

(Filed 6 May 1994)

**1. Jury § 141 (NCI4th) — murder — sentencing — jury selection — questions concerning parole eligibility**

The trial court did not err during jury selection for a first-degree murder sentencing hearing by denying defendant's motion to permit questioning of prospective jurors about their beliefs concerning parole eligibility and by denying defendant's request for an instruction on parole eligibility. Defendant failed to assert a convincing basis for the Supreme Court to abandon its prior authority on the issue of questioning or informing jurors with regard to potential parole eligibility; N.C.G.S. § 15A-2002, upon which defendant relies, applies prospectively only; and parole eligibility is not mitigating since it does not reflect on any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

**Am Jur 2d, Jury §§ 197, 201, 202.**

**2. Jury § 153 (NCI4th) — murder — sentencing — jury selection — death qualification**

The trial court did not err during jury selection for a first-degree sentencing hearing by permitting the prosecutor to ask prospective jurors certain questions for the purpose of death qualifying the jury. The questions employed by the prosecutor were appropriately tailored to apply the standard of *Wainwright v. Witt*, 469 U.S. 424, with regard to each juror and the court did not err in allowing the State's questions to form the basis for excusal for cause.

**Am Jur 2d, Jury §§ 197, 201-203, 290.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**Comment Note. — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

STATE v. GREEN

[336 N.C. 142 (1994)]

3. **Jury § 150 (NCI4th) — first-degree murder — sentencing — jury selection — rehabilitation of jurors**

The trial court did not err during jury selection in a first-degree murder sentencing hearing by refusing to allow defendant to attempt to rehabilitate prospective jurors who were excused for cause on the basis of their opposition to the death penalty. All of the jurors excused for cause after answering the prosecutor's questions had stated unequivocally that they would be unable to follow the law and recommend a sentence of death even if that was what the facts and circumstances required.

**Am Jur 2d, Jury §§ 197, 201-203, 290.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**Comment Note. — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

4. **Jury § 150 (NCI4th) — first-degree murder — sentencing — jury selection — rehabilitation of particular juror**

The trial court did not abuse his discretion during jury selection for a first-degree murder sentencing hearing by not allowing defendant to rehabilitate a particular prospective juror whom the State sought to excuse due to her views on the death penalty. Although it is error for a trial court to enter a general ruling that, as a matter of law, a defendant will never be allowed to attempt to rehabilitate a juror, and although a blanket forecast of intent to deny any motion to rehabilitate is not the wisest course, there was nothing in the trial judge's statements concerning defendant's motions or his rulings which indicates that he was not ruling in the exercise of his discretion.

**Am Jur 2d, Jury §§ 197, 201-203, 290.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**Comment Note. — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

5. **Jury § 64 (NCI4th) — first-degree murder — jury selection — motion to excuse prospective jurors for misconduct — made in presence of other prospective jurors**

There was no error during jury selection for a first-degree murder sentencing hearing where defendant moved that the entire panel be excused for misconduct after two prospective jurors were excused for reading a newspaper in the waiting area. Although defendant contended that there was error in that he was required to make the motion in the presence of the prospective jurors, the motion was heard only by the two prospective jurors who had been excused for cause but told to stay in the courtroom. No juror who heard the case could have heard the motion.

**Am Jur 2d, Jury § 227.**

6. **Jury § 145 (NCI4th) — first-degree murder — sentencing hearing — jury selection — knowledge of previous death sentence**

The trial court did not abuse its discretion during jury selection for a first-degree murder resentencing by denying defendant the opportunity to ask a potential juror whether he knew that the defendant had previously been sentenced to death when the juror revealed that he had been exposed to pretrial publicity about the case. The record in the present case shows that counsel had sufficient information upon which to base a peremptory challenge in that the juror identified the sources of his information, including an article of a few days past, and counsel for the defendant had shown familiarity with all of the publicity about the case when making earlier motions. Additionally, the trial court subsequently allowed counsel for the defendant to ask other prospective jurors whether they knew the outcome of the defendant's prior trial and counsel for the defendant could have returned to the prospective juror in question and attempted to raise this issue with that juror again. Furthermore, the juror stated unequivocally that he could base a sentencing recommendation entirely and completely upon the evidence which was presented at the capital sentencing proceeding without regard to what he had read in the newspaper or seen on television.

**Am Jur 2d, Jury §§ 197, 201-203, 290.**

Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.

7. **Jury § 194 (NCI4th) — first-degree murder — sentencing — jury selection — knowledge of previous sentence — no excusal for cause**

The trial court did not err during jury selection for a first-degree murder resentencing by denying defendant's motion to excuse for cause a juror who revealed that he was aware that the defendant had previously been sentenced to death for the same crimes. Knowledge of a prior sentence is not *per se* a reason for excusal and the juror stated that he could decide the case on the evidence.

**Am Jur 2d, Jury §§ 265 et seq.**

8. **Criminal Law §§ 1312, 1337 (NCI4th) — first-degree murder — sentencing — evidence of prior attempted rape — General Court Martial**

The trial court did not err in a sentencing hearing for first-degree murder by submitting evidence of a prior attempted rape conviction, submitting the aggravating circumstance of a prior felony involving violence, or in its instructions where the State submitted evidence that defendant had been convicted by General Court Martial of attempted rape. Attempted rape is a felony under North Carolina law, as well as under military law, and, since the military courts have held all rapes to be crimes of violence under military law, and all attempts to commit rape therefore by definition involve the use or threat of force, there was no need to consider whether there is a non-violent crime of attempted rape under North Carolina law. The evidence presented concerning the prior felony was proper and sufficient to establish that the defendant had been convicted of a prior felony involving the use or threat of violence to the person and the court's instruction did not constitute an impermissible conclusive presumption as it permitted the jury to make the determination as to whether defendant had been convicted. N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law §§ 598 et seq.; Evidence § 328.**

9. **Criminal Law § 1314 (NCI4th)— first-degree murder— sentencing hearing—plea bargain**

The trial court did not err in a first-degree murder resentencing by failing to strike plea agreements in which the State accepted guilty pleas to felony murder only. The plea bargain served only to limit the maximum time the defendant would serve in prison *if the jury failed to recommend a sentence of death* and did not "suppress" an aggravating circumstance supported by evidence or otherwise limit the sentence the jury could recommend for first-degree murder.

**Am Jur 2d, Criminal Law §§ 598 et seq.; Evidence § 328.**

10. **Criminal Law § 1363 (NCI4th)— first-degree murder— sentencing hearing—mitigating circumstance—guilty plea**

The trial court did not err in a sentencing hearing for first-degree murder by failing to give peremptory instructions on the nonstatutory mitigating circumstance that the defendant had pled guilty to both murder charges where the instruction specifically requested North Carolina Pattern Jury Instruction 150.11, which relates to peremptory instructions with regard to statutory mitigating circumstances. The law which should be imparted to a jury when giving peremptory instructions on *nonstatutory* mitigating circumstances is that before a juror "finds" a *nonstatutory* mitigating circumstance, he or she must make two preliminary determinations: (1) that the evidence supports the factual existence of the circumstance, *and* (2) that the juror deems the particular circumstance to have mitigating value in the case in question.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

11. **Criminal Law § 1323 (NCI4th)— first-degree murder— sentencing—instructions—mitigating circumstances—"may" rather than "must"**

The trial court did not err in a sentencing hearing for a first-degree murder by instructing the jury that they "may" rather than "must" find mitigating circumstances. The instruction given here is correct and would be interpreted by any reasonable juror as meaning that all "found" mitigating circumstances must be considered.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

12. **Criminal Law § 877 (NCI4th)— first-degree murder—sentencing—jury deliberations—jury note that one juror does not believe in capital punishment—instructions**

The trial court did not err when sentencing defendant for first-degree murder where the jury sent a note to the court after deliberations began indicating that one juror had not understood the questions during jury selection and did not believe in capital punishment, the court called the entire jury into the courtroom and told the jury that the matter could not then be addressed and that the jury must continue its deliberations with a view toward reaching a verdict if it could without violence to individual judgment. The trial court insured that no juror would be embarrassed or pressured in open court by not reading the note aloud and emphasized that the deliberations should continue without violence to individual judgment.

**Am Jur 2d, Trial §§ 1054 et seq.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

**Instructions urging dissenting jurors in state criminal case to give due consideration to opinion of majority (Allen charge)—modern cases. 97 ALR3d 96.**

13. **Criminal Law § 878 (NCI4th)— first-degree murder—sentencing—deliberations—further instruction on unanimity**

The trial court did not err in a sentencing hearing for two first-degree murders where the jury sent the court a note during deliberations asking if the jury decision had to be unanimous on both recommendations and the court instructed the jury that any recommendation they made as to sentencing must be unanimous. The jury did not inquire as to what would result if it failed to reach a sentencing recommendation, but merely inquired as to whether it must be unanimous to make such a recommendation. Furthermore, the jury sent another note to the judge eighteen minutes later indicating that they were unable to reach a unanimous decision in either case. There is no need to speculate as to whether the instructions were misleading or led to a coerced verdict; the jurors clearly

understood that they could report that they were unable to reach a unanimous decision in either case.

**Am Jur 2d, Trial §§ 1054 et seq.**

**Comment Note.** — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.

**Instructions urging dissenting jurors in state criminal case to give due consideration to opinion of majority (Allen charge) — modern cases. 97 ALR3d 96.**

14. **Criminal Law § 881 (NCI4th) — first-degree murder — sentencing — deadlocked jury — Allen charge**

The trial court did not err during jury deliberations at a first-degree murder sentencing hearing where the jury indicated its inability to reach a unanimous recommendation and the court gave an instruction substantially similar to the *Allen* charge which called the jury's attention to the fact that "[a]ll of us have a considerable amount of time in this case." The sentence complained of, when read in conjunction with the next sentence of the instructions, simply suggested to the jury that they had devoted a substantial amount of time to the defendant's cases, that they were to be commended for their diligence, and that they should continue to deliberate if a recommendation was possible. Further, throughout the charge the trial court continually reminded the jurors to avoid "violence to individual judgment," "decide the case for yourself," and "not to surrender your honest convictions . . . *for the mere purpose of making a recommendation.*" The essence of the instructions was merely to ask the jury to continue to deliberate. N.C.G.S. § 15A-1235.

**Am Jur 2d, Trial §§ 1054 et seq.**

**Comment Note.** — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.

**Instructions urging dissenting jurors in state criminal case to give due consideration to opinion of majority (Allen charge) — modern cases. 97 ALR3d 96.**

STATE v. GREEN

[336 N.C. 142 (1994)]

15. **Criminal Law § 881 (NCI4th)— first-degree murder—sentencing—supplemental instructions—not coercive**

The trial court did not err in a first-degree murder prosecution in supplemental instructions which defendant contended a reasonable juror would likely interpret as meaning that the law requires unanimity and jurors who are in disagreement are not following the law. The complained of remarks merely reminded jurors of their prior instructions and were followed almost immediately by the trial court's specific direction to jurors that they should not surrender their honest convictions or compromise their convictions "for the mere purpose of making a recommendation."

**Am Jur 2d, Trial §§ 1054 et seq.**

16. **Criminal Law § 1363 (NCI4th)— first-degree murder—mitigating circumstances—model prisoner**

There was no prejudicial error in a sentencing hearing for first-degree murder where the trial court refused to submit the mitigating circumstance that defendant will continue to adjust well to prison life and be a model prisoner. Although the evidence was sufficient to support submission of this circumstance, which the Supreme Court of the United States has held to be relevant to the sentencing determination, all of the jurors rejected both defendant's present model prisoner status and his prior model prisoner status at Levenworth. All of the evidence tending to support the circumstance not submitted was considered by the jury under those submitted circumstances and under the catch-all circumstance.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

17. **Criminal Law § 1363 (NCI4th)— first-degree murder—mitigating circumstances—good student**

The trial court did not err in a first-degree murder sentencing hearing by not submitting the nonstatutory mitigating circumstance that defendant was "a quiet student in school and was not a discipline problem" where two of defendant's teachers testified to that effect but it was uncontroverted that defendant was expelled from high school due to fighting and for that reason joined the army.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

18. **Criminal Law § 1363 (NCI4th)— first-degree murder— sentencing—mitigating circumstances—killing not premeditated and deliberated**

The trial court did not err during a sentencing hearing for first-degree murder by failing to submit the nonstatutory mitigating circumstance that defendant did not kill after premeditation and deliberation. The fact that the defendant pled guilty to the first-degree murders under the felony murder theory and was neither tried nor convicted of those crimes on the theory of premeditation and deliberation is not mitigating; felony murder and premeditation and deliberation reflect notions of equivalent blameworthiness or culpability. Moreover, a mitigating circumstance must be established by evidence and to the satisfaction of the jury. There was no evidence tending to show that the defendant did not act with premeditation and deliberation and evidence was introduced which supported the premeditation and deliberation theory of first-degree murder.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

19. **Criminal Law § 1363 (NCI4th)— first-degree murder— sentencing—mitigating circumstances—no intent to kill—did not enter building with weapon**

There was no prejudicial error in a first-degree murder prosecution where the court refused to submit as possible nonstatutory mitigating circumstances that the defendant did not intend to take the lives of the victims and did not enter the building where they were killed with the weapon which was used to take their lives. There were self-serving portions of a statement defendant made to the police which did tend to support these circumstances; however, the evidence supporting these circumstances was fully argued to and impressed upon the jury by counsel for the defendant during their closing arguments. The jurors must have considered all of this evidence when they considered and in fact found the catch-all mitigating circumstance.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

20. **Criminal Law § 452 (NCI4th) — first-degree murder — sentencing hearing — argument of prosecutor — two murders, one life sentence**

A defendant in a first-degree murder prosecution was not denied a fair capital sentencing hearing where the prosecutor argued to the jury that defendant would "get two for the price of one" if he was given life rather than death for two killings. Although defendant contends that this argument was a misstatement of the law because the prosecutor knew that there was the possibility that the defendant would suffer additional punishment for a second life sentence as a result of having his parole eligibility date extended, the argument appears to have been properly directed to the question of the weight the jury should give the course of conduct aggravating circumstance; assuming error, however, there could have been no prejudice because counsel for defendant had made similar statements during their questioning of jurors during jury selection.

**Am Jur 2d, Trial §§ 229, 497 et seq.**

21. **Criminal Law § 442 (NCI4th) — first-degree murder — sentencing — prosecutor's argument — jury's responsibility**

A first-degree murder defendant was not denied a fair sentencing hearing where the prosecutor argued that the jury was deciding and weighing factors rather than the sentence of life or death, but also spoke of the difficulty of the decision. Taken in context, the closing argument clearly and properly stated to the members of the jury that the ultimate responsibility for a sentencing decision rested with them and with no one else.

**Am Jur 2d, Trial §§ 225 et seq.**

22. **Criminal Law § 438 (NCI4th) — first-degree murder — sentencing — prosecutor's argument — model prisoner and college student**

A first-degree murder defendant was not denied a fair sentencing hearing by the prosecutor's disparaging references in closing arguments to defendant's status as a model prisoner and to the fact that he was attending college where the pros-

STATE v. GREEN

[336 N.C. 142 (1994)]

ecutor's comments were direct responses to specific arguments made by counsel for the defendant.

**Am Jur 2d, Trial §§ 497 et seq.**

23. **Criminal Law § 447 (NCI4th)— first-degree murder— sentencing—prosecutor's argument concerning victims**

There was no error requiring the trial court to intervene ex mero motu in a first-degree murder sentencing hearing where the prosecutor argued that the victims, who had been killed at 6:00 p.m. at a dry cleaner's, had been at the same place "you and I might be." Although defendant contended that the prosecutor asked the jurors to put themselves in the victims' place, the prosecutor was arguing that the victims' behavior did not invite attack, they were not at a place where an attack could reasonably be anticipated, were not careless, and were merely engaging in activity common to all humanity.

**Am Jur 2d, Trial §§ 497 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

24. **Criminal Law § 1056 (NCI4th)— first-degree murder— sentencing—motion for allocution denied—no error**

The trial court did not err in a first-degree murder sentencing hearing by denying defendant's motion for allocution. A defendant does not have a right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding; the only remnant of the common law right of allocution remaining in capital cases is the right to present strictly legal arguments to the presiding judge as to why no judgment should be entered. N.C.G.S. § 15A-1334 has no application to capital sentencing proceedings which are conducted pursuant to N.C.G.S. § 15A-2000. There is no constitutional need, much less requirement, for a right of a defendant to make unsworn factual statements to the jury during a capital sentencing proceeding without being subject to cross-examination because the defendant is allowed to take the stand and testify.

**Am Jur 2d, Criminal Law § 531.**

**Necessity and sufficiency of question to defendant as to whether he has anything to say why sentence should not be pronounced against him. 96 ALR2d 1292.**

**25. Criminal Law § 1373 (NCI4th) — first-degree murder — death sentence — not disproportionate**

A death sentence for two murders during a robbery was not disproportionate where the record supports the aggravating circumstances found by the jury, there is no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration, and the case falls within the class of cases in which the death penalty was previously upheld.

**Am Jur 2d, Criminal Law § 628.**

Appeal of right by the defendant pursuant to N.C.G.S. § 7A-27(a) from two judgments imposing sentences of death entered by Brown, J., on 3 September 1992 in the Superior Court, Pitt County. Heard in the Supreme Court on 16 November 1993.

*Michael F. Easley, Attorney General, by Joan H. Byers, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant pled guilty, solely on the basis of the theory of felony murder, to the first-degree murders of Sheila Bland and Michael Edmondson and to two counts of common law robbery. A capital sentencing proceeding was conducted pursuant to N.C.G.S. § 15A-2000, and the jury recommended that he be sentenced to death for each murder. The trial court entered judgments of death in accord with the jury's recommendations and arrested judgment in the robbery cases. The defendant appealed.

This Court remanded the case to the Superior Court, Pitt County, for a hearing as to whether the defendant's rights had been denied by racial discrimination in selecting the jury contrary to the principles set forth in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). *State v. Green*, 324 N.C. 238, 376 S.E.2d 727 (1989). A hearing was held, after which the Superior Court concluded that there had been no racial discrimination in the selection of the defendant's jury. The case was then returned to this Court.

STATE v. GREEN

[336 N.C. 142 (1994)]

We remanded the case to the Superior Court a second time for a further hearing on the *Batson* issue. It made further and more detailed findings of fact and again found no *Batson* error. The case was again returned to this Court.

The State then filed a motion in which it conceded prejudicial error under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), and moved that the defendant receive a new capital sentencing proceeding. This Court ordered the case remanded to the Superior Court, Pitt County, for that purpose. *State v. Green*, 329 N.C. 686, 406 S.E.2d 852 (1991).

A new capital sentencing proceeding was held. As to both murders the jury found the statutory aggravating circumstances that:

(1) The defendant had been previously convicted of a felony involving the use or threat of violence.

(2) The murder was committed for pecuniary gain.

(3) This murder was part of a course of conduct in which the defendant engaged and the course of conduct involved another crime of violence against another person.

The jury also found seven mitigating circumstances. The jury again recommended sentences of death for each of the two first-degree murders, and the trial court entered judgments accordingly. The defendant appeals to this Court as a matter of right from the judgments sentencing him to death for each of the first-degree murders.

On 19 December 1983, Michael Edmondson and Sheila Bland were beaten to death at Young's Cleaners in Bethel, North Carolina during a robbery. On 16 January 1984, the Grand Jury of Pitt County returned true bills of indictment charging the defendant, Harvey Lee Green, Jr., with first-degree murder for each of these killings.

The State's evidence introduced during the capital sentencing proceeding tended to show, *inter alia*, the following. On 19 December 1983, Sheila Bland, a seventeen-year-old high school senior, was working as a cashier at Young's Cleaners. She came to work at approximately 1:00 p.m. At 6:00 p.m. she was to close the cleaners, lock the doors and leave.

STATE v. GREEN

[336 N.C. 142 (1994)]

John Michael Edmondson, then thirty-three years old, was the organist for Bethel United Methodist Church. On the afternoon of 19 December 1983, choir practice for an upcoming Christmas play at the church ended a little before 6:00 p.m. Michael Edmondson told Holly Teeterson that he had to be somewhere by 6:00 p.m. and left the church. The church is just across the street and around the corner from Young's Cleaners.

Lynn Rogerson had dinner on 19 December 1993 at Da-Nite Cafe and afterwards, at just after 6:00 p.m., she started to go into the cleaners to leave some laundry. She looked through the windows of the cleaners and noticed that the lights were on but that Sheila Bland was not sitting behind the counter where she usually sat. No one appeared to be in the cleaners.

About 6:45 p.m., Mrs. Frances Young, a co-owner of the cleaners, drove by and noticed that the lights were on but that no one was in the front. When Mrs. Young went to the door of the cleaners, it was unlocked and she entered. Nothing appeared out of place or unusual in the front of the building. She called for Ms. Bland and then went to the back of the building. She looked over a partition and saw the bodies of Ms. Bland and Mr. Edmondson lying face down in a pool of blood. Their heads were "right up against the partition." Mrs. Young then called for help. When the rescue squad and police arrived, both victims were dead. The bodies were lying roughly parallel to each other, directly behind the partition. They were lying in pools of blood and had obvious head wounds. The cleaners itself showed no other signs of any disturbance.

Mr. Edmondson had died as a result of a trauma to his head causing skull fractures and bruising of the brain. That injury had been produced by a stiff rod-like instrument. Ms. Bland's death was the result of blows to the head causing fractures and contusions of the brain. Incomplete manual strangulation had contributed to her death.

Sometime between 7:30 and 8:00 p.m. on the evening of 19 December 1983, the defendant went into the Whitehurst grocery near the cleaners. A few minutes later, the people in the grocery learned about the murders at Young's Cleaners and went down the street to see what had happened. A search of the cleaners revealed that the rolled coins kept in a bank bag under the counter had been taken. The electric cash register had not been opened. A length of pipe used by the pressers and ordinarily placed on

one of the machines in back of the cleaners was also missing. The night of the murders, the defendant presented several dollars worth of rolled pennies to Joe Suggs at Whitehurst grocery in exchange for paper money.

On 30 December 1983, the Bethel police recovered a piece of pipe from the yard of a residence located between the cleaners and the defendant's residence. The pipe tested positively for blood. Hair on the pipe was consistent with that of Michael Edmondson.

On 31 December 1983, officers of the SBI and the Bethel Police Department spoke to the defendant about the rolled coins he had exchanged for bills on the night of the murders. The defendant Green admitted to the officers that on one occasion he had used rolled coins, but he denied having gone to the cleaners at any time on 19 December 1983 or committing the two murders. He allowed officers to look at the clothes and shoes he claimed he had worn on that night.

On 1 January 1984, the defendant was again questioned. He again denied involvement in the murders. Special Agent Godly then spoke with the defendant for about an hour. The defendant gave Godly a statement to the effect that he had used a toy gun to rob the cleaners. He said that Ms. Bland had been alone at first. When Mr. Edmondson came in, the defendant turned around to see who had entered. Ms. Bland jumped over the counter onto the defendant's back, and Mr. Edmondson struggled with the defendant. The defendant then flipped Ms. Bland off of his back, subdued Mr. Edmondson, and made the two victims get down by the counter. He took the coins from under the counter and then went back and demanded money from the victims. Mr. Edmondson gave him twenty dollars, but then struggled with him again. In the struggle, the defendant grabbed a pipe and used it to beat Mr. Edmondson. Ms. Bland started screaming, and the defendant told her to stop. When she did not, he hit her with the pipe. The defendant tried to get Mr. Edmondson to open the cash register for him. The defendant then beat the victims with the pipe. Thereafter, he took the rolled coins, left the building, and hid the pipe in some bushes. The defendant told Godly that he never meant to hurt anyone.

Godly called in another agent of the SBI and the Police Chief of Bethel who took a similar but more detailed statement. The defendant explained that he had committed the robbery because

he needed money to pay off checks he had forged. He had thought that he could get at least half of the money he needed from the cleaners. He stated that on the day of the murder he had shared a pint of wine with his brother, his brother's girlfriend, and George Purvis. He clarified that he took the victims to the back behind the partition after having scuffled with them in the front of the cleaners.

After completing his statement, the defendant accompanied officers to his home where he gave them the pants he had worn on the night of the murders. They had minute blood splatters on the front of both legs. The defendant also showed the officers where he had hidden the pipe.

Other evidence introduced during the capital sentencing proceeding is discussed at other points in this opinion where pertinent to the issues raised by the defendant.

[1] In an assignment of error the defendant contends that the trial court erred by denying his motion to permit questioning of prospective jurors about their beliefs concerning parole eligibility and by denying his request for an instruction on parole eligibility. The defendant argues that because the General Assembly has recently amended N.C.G.S. § 15A-2002 to require the trial court to instruct the jury during a capital sentencing proceeding concerning the parole eligibility of a defendant sentenced to life (1993 N.C. Session Laws Ch. 538, § 29), he was entitled to such an instruction in this case. We disagree.

First, the defendant has failed to assert a convincing basis for this Court to abandon its prior authority on the issue of questioning or informing jurors with regard to potential parole eligibility of a defendant. *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993), *reh'g denied*, --- U.S. ---, 126 L. Ed. 2d 707 (1994); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 582, *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 232 (1991); *State v. Price*, 326 N.C. 56, 338 S.E.2d 84, *sentence vacated*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *mandate reinstated*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated*, --- U.S. ---, 122 L. Ed. 2d 113 (1993), *mandate reinstated*, 334 N.C. 615, 433 S.E.2d 746 (1993); *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 909 (1989), *sentence vacated on other grounds in light of McKoy*, 494 U.S. 1050, 108 L. Ed. 2d 756 (1990). Second, the legislation the defendant relies upon applies prospectively only. As the legislation was not

made to apply retroactively, it has no effect in this case. Finally, parole eligibility is not mitigating since it does not reflect on "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper v. South Carolina*, 476 U.S. 1, 4, 90 L. Ed. 2d 1, 6 (1986). This assignment of error is therefore overruled.

[2] By another assignment of error, the defendant contends that the trial court erred in permitting the prosecutor to ask prospective jurors inappropriate and misleading questions for purposes of "death qualification" during the jury *voir dire*. The defendant contends that the questions asked did not reveal any jurors who were excusable as a matter of law and the trial court erred in excusing jurors on the basis of their answers to these questions. We disagree.

The prosecutor asked each prospective juror five general questions: (1) if the juror had any personal or moral beliefs against the death penalty; (2) if the juror could conceive of any first-degree murder case where the juror believed the death penalty would be the right and correct punishment; (3) if, after examining the aggravating and mitigating circumstances, the juror was satisfied from the law that the death penalty was called for, would the juror in good conscience to his own beliefs be able or unable to recommend a sentence of death; (4) could the juror vote for the death penalty knowing the juror had to go back into court and be polled; and (5) if the juror could sign the sentence recommendation if selected as foreman. If potential jurors indicated an inability or reluctance to recommend a death sentence, the prosecutor, prior to challenging for cause, would ask if that inability was without regard to the facts and circumstances of the case. The defendant only objected to the third question due to its hypothetical nature.

The test for determining whether a prospective juror may be properly excused for cause for his views on the death penalty is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985); *accord, e.g., State v. Davis*, 325 N.C. 607, 621-22, 386 S.E.2d 418, 425 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990). The questions employed by the prosecutor were appropriately tailored to apply the *Witt* standard with regard to each juror. The trial court did not err in allowing the

State's questions to form the basis for excusal for cause under *Witt. See, e.g., State v. Jennings*, 333 N.C. 579, 595-96, 430 S.E.2d 188, 194-95, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 602 (1993); *State v. Syriani*, 333 N.C. 350, 371, 428 S.E.2d 118, 128 (1993).

We have recognized that a prospective juror's bias may not always be "provable with unmistakable clarity [and,] [i]n such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990).

> [M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Witt*, 469 U.S. at 424-26, 83 L. Ed. 2d at 852.

Both the defendant and the State have the right to question prospective jurors about their views on capital punishment. *E.g., State v. Wilson*, 313 N.C. 516, 526, 330 S.E.2d 450, 458 (1985). The extent and manner of such an inquiry, however, lies within the trial court's discretion. *State v. Taylor*, 332 N.C. 372, 390, 420 S.E.2d 414, 425 (1992). "A challenge for cause . . . may be made by any party on the ground that the juror . . . [a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." N.C.G.S. § 15A-1212(8) (1988). The ruling of the trial court will not be disturbed absent abuse of discretion. *Wilson*, 313 N.C. at 526, 330 S.E.2d at 458. Here, the trial court did not abuse its discretion in excusing the prospective jurors for cause.

[3] The defendant also asserts as error under this assignment the trial court's refusal to allow him to further question or attempt to "rehabilitate" the prospective jurors who were excused for cause on the basis of their opposition to the death penalty. "The defendant is not allowed to rehabilitate a juror who has expressed unequivocal

opposition to the death penalty in response to questions propounded by the prosecutor and the trial court. The reasoning behind this rule is clear. It prevents harassment of the prospective jurors based on their personal views toward the death penalty." *State v. Cummings,* 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990).

> "To allow defense counsel to cross-examine a juror who has informed the court and counsel that he is irrevocably committed to vote against any verdict which would result in a death sentence would thwart the protective purposes of G.S. 9-21(b). Further it would be a purposeless waste of valuable court time . . . ."

*State v. Brogden,* 334 N.C. 39, 45, 430 S.E.2d 905, 909 (1993) (quoting *State v. Bock,* 288 N.C. 145, 156, 217 S.E.2d 513, 520 (1975), *judgment vacated in part,* 428 U.S. 903, 49 L. Ed. 2d 1209 (1976) ).

Our review of the record indicates that all of the jurors excused for cause after answering the prosecutor's questions had stated unequivocally that they would be unable to follow the law and recommend a sentence of death, even if that was what the facts and circumstances required. Therefore it was not error for the trial court to deny the defendant's request to attempt to rehabilitate those jurors. This assignment of error is overruled.

[4] By another assignment of error, the defendant contends that the trial court committed reversible error by holding as a matter of law that the defendant could not be allowed to attempt to rehabilitate prospective Juror Morris whom the State sought to excuse for cause due to her views concerning the death penalty. The record before us does not demonstrate that Judge Brown, who presided over this sentencing proceeding, was ruling as a matter of law when he refused to allow the defendant to attempt to rehabilitate prospective Juror Morris. It is true that another Superior Court Judge, in a motion hearing prior to this sentencing proceeding, denied a general motion by the defendant that he be allowed to seek to rehabilitate all prospective jurors before they were excused for cause for their views on the death penalty. At the beginning of the defendant's sentencing proceeding, however, the defendant renewed this six-page motion which culminated with his request that "the court enter an order allowing counsel for Defendant to ask further questions (i.e., rehabilitate) any juror challenged by the State for cause." Although the written motion seems to have requested that the trial court rule in the defendant's

favor on this motion as a matter of law, the oral arguments in support of the motion by counsel for the defendant clearly revealed that counsel was addressing the trial court's discretion. Counsel for the defendant expressly stated: "I don't know how Your Honor handles that. Seems like each judge is different on what he allows. But we filed that . . . motion. I don't know whether I could get some guidance from the bench on that." Judge Brown denied the defendant's written motion for a blanket order granting him the right to attempt to rehabilitate each and every juror challenged for cause due to the juror's views on the death penalty. Judge Brown then indicated that counsel for the defendant could make a request to rehabilitate with regard to any individual juror at the appropriate time. However, Judge Brown indicated that he would deny any such motion. Although such a blanket forecast of intent by a trial court is not the wisest course of action available, we find nothing in Judge Brown's statements concerning the defendant's motions or in his rulings which indicates that he was not ruling in the exercise of his discretion. In fact, as we have indicated, the defendant's counsel at trial seems to have characterized his motion as one directed to the trial court's discretion, and Judge Brown ruled on that motion in light of such characterization. Accordingly, we conclude that the trial court exercised its discretion in denying the defendant's written motion and his later motions to be allowed to attempt to rehabilitate jurors challenged for cause due to their views on the death penalty.

It is error for a trial court to enter a general ruling that, as a matter of law, a defendant will never be allowed to attempt to rehabilitate a juror when the juror's answers to questions by the prosecutor or the trial court have indicated that the juror may be unable to follow the law and fairly consider the possibility of recommending a sentence of death. *State v. Brogden*, 334 N.C. 39, 430 S.E.2d 905 (1993). However, the trial court made no such ruling here. We conclude in the present case that both Judge Brown's ruling on the defendant's general motion to be allowed to attempt to rehabilitate in every instance and Judge Brown's ruling on the defendant's specific request to be allowed to attempt to rehabilitate prospective Juror Morris after she had been challenged for cause due to her views on the death penalty were rulings made in his discretion. Further, our review of the record in this case leads us to conclude that the trial court did not abuse its discretion in this regard. This assignment of error is without merit and is overruled.

[5]　By another assignment of error, the defendant contends that the trial court erred in requiring counsel for the defendant to make his motion to excuse prospective jurors for misconduct in the presence of other prospective jurors. We disagree.

During jury selection, a number of prospective jurors admitted to having read an article about the defendant's case in a newspaper that had been in the jury room used by the prospective jurors waiting to be questioned. The defendant moved to strike the remaining prospective jurors who might have been exposed to the publicity. The trial court insisted that the defendant's counsel make this motion in the presence of the prospective jurors in the courtroom at that time, and then denied the motion. The defendant contends that the effect of this was to deny him a fair jury selection by putting his counsel in the untenable position of having to criticize the conduct of prospective jurors in their presence.

The record shows that at the beginning of jury selection, twelve prospective jurors were called into the jury box. They were then placed in the jury room. The trial court then stated to the remaining prospective jurors still in the courtroom:

> All right, ladies and gentlemen, we are making arrangements for you to wait in another area during the jury selection process, and you will be taken to that area in just a minute.

Those prospective jurors were then sent to a courtroom on the third floor. The trial court later instructed the original twelve prospective jurors to report back to the jury room the next morning. The court then had the remaining prospective jurors brought back in and told them to return to the third floor courtroom the next morning. Both groups were reminded that they were not to discuss the case nor were they to read or listen to any news about the case.

When the defense counsel finished with the first twelve jurors passed to them by the State, seven jurors had been selected. Those seven were permitted to go home. Thereafter, as jurors were selected, they were permitted to go home. The transcript shows that the trial court continued the process of keeping the prospective jurors who had not been questioned in a room other than the courtroom where the questioning took place.

As of the fourth day of jury selection, the time at which the incident complained of occurred, ten jurors had been selected and

sent home. Two prospective jurors were passed to the defendant. One of those jurors admitted that since the beginning of the jury selection she had been reading the newspaper in the waiting area. She was excused but told to remain in the courtroom. The second juror was seated and then sent home.

Prior to any other prospective juror reaching the courtroom, counsel for the defendant moved to excuse the remainder of the panel of prospective jurors. This motion was denied and the next prospective juror was brought into the courtroom. This juror too admitted to reading an article on the previous day while sitting upstairs waiting to be called. This prospective juror was also excused for cause. The trial court lectured this juror and the one excused earlier, but still in the courtroom, and ordered them to take a seat in the courtroom. At that point, counsel for the defendant renewed the motion to excuse the remainder of the prospective jurors for misconduct, which the trial court ordered him to do in open court "so that these jurors can hear what you are asking me to do." Counsel for the defendant then made the motion which the trial court denied. Thus, this motion was heard only by the two prospective jurors the trial court had already excused for cause but told to stay in the courtroom. Only after the renewal of the motion had been made and denied, did the next prospective juror come into the courtroom. No juror who sat on the defendant's case could have heard the motion. After the motion was denied, the remainder of the prospective jurors were brought back into the courtroom and reminded not to read about the case. This argument is meritless since no jurors who sat on this case could have heard the motion. This assignment of error is overruled.

[6] By another assignment of error, the defendant contends that the trial court erred in denying him the opportunity to ask a potential juror whether he knew that the defendant had previously been sentenced to death. The defendant contends that his right to make an intelligent use of his peremptory challenges was impaired. Because our examination of the transcript of the jury *voir dire* persuades us otherwise, we disagree.

One juror revealed that he had been exposed to pretrial publicity about the case, and counsel for the defendant asked him if he knew "the result of the first trial in this matter then?" The trial court sustained the prosecutor's objection and refused to let the juror answer. The juror ultimately was seated and served on the jury.

STATE v. GREEN

[336 N.C. 142 (1994)]

The trial court has the duty to supervise the examination of prospective jurors. Regulation of the manner and the extent of inquiries on *voir dire* rests largely in the trial court's discretion. *State v. Young*, 287 N.C. 377, 387, 214 S.E.2d 763, 771 (1975), *death penalty vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976); N.C.G.S. § 9-14 (1986). A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Carson*, 320 N.C. 328, 357 S.E.2d 662 (1987).

We have stated that:

"The voir dire examination of prospective jurors serves a dual purpose: (1) to ascertain whether grounds exist for challenge for cause and (2) to enable counsel to exercise intelligently the peremptory challenges allowed by law. *State v. Allred*, 275 N.C. 554, 169 S.E.2d 833 (1969). 'Obviously, prospective jurors may be asked questions which will elicit information not, per se, a ground for challenge in order that the party, propounding the question, may exercise intelligently his or its peremptory challenges.' [*State v. Jarrette*, 284 N.C. 625, 202 S.E.2d 721 (1974)]."

*State v. Allen*, 322 N.C. 176, 190, 367 S.E.2d 626, 633 (1988) (quoting *State v. Young*, 287 N.C. at 387, 214 S.E.2d at 771); *see also* N.C.G.S. § 15A-1214(c) (1986). The record in the present case shows that counsel had sufficient information upon which to base a peremptory challenge. The juror identified the sources of his information, including an article of a few days past. Counsel for the defendant had shown familiarity with all of the publicity about the case, including all recent articles, when making earlier motions concerning them. Counsel knew from the recent articles the extent of the juror's information. In passing the juror the defendant's lawyers seem to have assumed he knew the result of the prior capital sentencing proceeding as they requested a special instruction that he not communicate his knowledge concerning the case to the other jurors, even during deliberation. The trial court gave that instruction. We conclude that the defendant was not denied an adequate opportunity to form a basis upon which to intelligently exercise his peremptory challenges.

Additionally, the record before us reveals that after the juror in question here had been examined, the trial court began to let counsel for the defendant ask other prospective jurors whether

STATE v. GREEN

[336 N.C. 142 (1994)]

they knew the outcome of the defendant's prior trial. At that point, counsel for the defendant could have returned to the prospective juror in question and attempted to raise this issue with that juror again. The fact that counsel for the defendant did not make any such attempt also indicates that counsel for the defendant believed themselves to possess sufficient information regarding the juror's knowledge to exercise the defendant's peremptory challenge intelligently.

Furthermore, any error that may have occurred was harmless. This Court recently declined to impose a *per se* rule to the effect that any juror with knowledge that a previous jury had returned a recommendation of death in the same case to be heard must be excused for cause. *State v. Simpson*, 331 N.C. 267, 415 S.E.2d 351 (1992). Here, the juror stated unequivocally that he could base a sentencing recommendation entirely and completely upon the evidence which was presented at the capital sentencing proceeding without regard to what he had read in the newspaper or seen on television.

Because there was no basis for a challenge for cause and the defendant had sufficient information to exercise a peremptory challenge intelligently, the trial court did not abuse its discretion. This assignment of error is therefore overruled.

[7] By another assignment of error, the defendant contends that the trial court erred in denying his motion to excuse for cause a juror who revealed that he was aware that the defendant had previously been sentenced to death for the same crimes. Because knowledge of a prior sentence is not *per se* a reason for excusal and because the juror stated that he could decide the case on the evidence, we disagree.

When the juror was questioned by the District Attorney, the following colloquy occurred:

MR. HAIGWOOD: Okay. If you were selected as a juror in this case could you and would you set aside from your mind what you heard about this case back in '83 and '84 and possibly what you may have heard from your, niece, ah, people that you know in Bethel, and decide this case, ah, entirely and completely upon the evidence that comes from the witness stand here, ah, in the next—in the coming days and—in accordance with the Judge's instructions as to the law?

JUROR: I will try.

MR. HAIGWOOD: Well, ah, would you do that, sir? To the best of your ability would you do that?

JUROR: To the best of my ability, yes.

Thereafter, the juror was asked several questions by counsel for the defendant. He consistently indicated that he believed he could base his recommendation in this case solely on the evidence presented in the courtroom during the capital sentencing proceeding, but he did concede at one point that he did not "believe there is any way I could be absolutely sure." Counsel for the defendant challenged the juror for cause, and the trial court denied that challenge. Counsel for the defendant then asked a final question and received an answer as follows:

MR. HULBERT: Ah, okay. One more question and then I'll move on. Would that substantially impair your ability to decide the case, that prior knowledge? Would that prior knowledge do you think, substantially impair your ability to decide the case based on the evidence that you hear in the courtroom as it comes?

JUROR: I don't believe it would.

The defendant then peremptorily excused the juror. Later after the defendant had exhausted his peremptory excusals, he attempted to renew his challenge of that juror for cause. The challenge was again denied.

N.C.G.S. § 15A-1212 provides in part:

A challenge for cause to an individual juror may be made by any party on the ground that the juror:

. . . .

(9) For any other cause is unable to render a fair and impartial verdict.

The granting of a challenge for cause under N.C.G.S. § 15A-1212(9) rests in the sound discretion of the trial court. *See, e.g., State v. Cunningham*, 333 N.C. 744, 753, 429 S.E.2d 718, 723 (1993); *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992); *State v. Quick*, 329 N.C. 1, 17, 405 S.E.2d 179, 189 (1991); *State v. Watson*, 281 N.C. 221, 227, 188 S.E.2d 289, 293, *cert. denied,*

409 U.S. 1043, 34 L. Ed. 2d 493 (1972). We will not disturb the trial court's ruling on a challenge for cause absent a showing of an abuse of that discretion. *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993).

Where the trial court can reasonably conclude from the *voir dire* examination that a prospective juror can disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence, excusal is not mandatory. *State v. Simpson*, 331 N.C. 267, 415 S.E.2d 351 (1992); *see also Mu'Min v. Virginia*, 500 U.S. 415, ---, 114 L. Ed. 2d 493, 509, *reh'g denied*, --- U.S. ---, 115 L. Ed. 2d 1097 (1991) (relevant question when trial preceded by extensive pretrial publicity is not whether jurors remember the case but whether they have such fixed opinions that they cannot judge the defendant impartially).

Here, the juror reiterated that he believed he could return a sentence recommendation based on evidence presented in the courtroom, that to the best of his ability he would divorce his knowledge of the prior sentence from his mind, and that he did not believe the prior knowledge would substantially impair his ability to decide the case based on the evidence. These answers were sufficient to support the actions of the trial court, which heard the answers and observed the juror's demeanor. Therefore, we conclude that the trial court did not abuse its discretion by denying the challenge for cause. This assignment of error is overruled.

[8] By his next assignment of error, the defendant contends that the trial court erred in submitting evidence of his prior attempted rape conviction and by submitting as an aggravating circumstance that the defendant had "been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3) (1988). The defendant contends that this aggravating circumstance was not supported by the evidence. We disagree.

In order to submit this aggravating circumstance, evidence must be introduced tending to show:

that (1) defendant had been convicted of a felony, that (2) the felony for which defendant was convicted involved the "use or threat of violence to the person," and that (3) the conduct upon which this conviction was based was conduct which oc-

curred prior to the events out of which the capital felony charge arose.

*State v. Goodman,* 298 N.C. 1, 22, 257 S.E.2d 569, 583 (1979); N.C.G.S. § 15A-2000(e)(3) (1988). The State need not show that the defendant in fact acted violently in the prior felony; the State need only show a previous felony involving the use or threat of violence. *State v. Hamlette,* 302 N.C. 490, 276 S.E.2d 338 (1981), *rev. denied,* 308 N.C. 193, 302 S.E.2d 246 (1983). Under N.C.G.S. § 15A-2000(e)(3), a prior felony can be either one which has as an element the use or threat of violence to the person, such as rape or armed robbery, or a felony which does not have the use or threat of violence to the person as an element, but as to which the use or threat of violence to the person was actually involved. *State v. McDougall,* 308 N.C. 1, 18, 301 S.E.2d 308, 318, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 173 (1983).

> The statute contains the word "involving," which indicates an interpretation much more expansive than one restricting the jury to consider only felonies having the use or threat of violence to the person as an element. . . . [W]e find the legislature intended the prior felony in . . . (e)(3) to include any felony whose commission involved the use or threat of violence to the person.

*McDougall,* 308 N.C. at 18, 310 S.E.2d at 319.

The State presented evidence that on 26 July 1982, the defendant was convicted by General Court Martial of attempted rape. The trial court allowed the certified record of the defendant's conviction to be read to the jury and admitted into evidence. The certified record stated that:

> Specialist 4 Harvey L. Green . . . [tried] by a general court martial on the 26th day of July of 1982 for a violation of the Uniform Code of Military Justice, Article 80, specifically in that Specialist Green . . . did . . . attempt to rape Specialist 4 Patricia L. Peterson; of charge one and it's [sic] specifications, the judgment of that military court is guilty.

An attempt to commit a crime, under the Uniform Code of Military Justice, Article 80 (10 U.S.C. § 880), occurs when an act is done with specific intent to commit an offense and this overt act amounts to more than mere preparation. While it does not have to be the last act to completion of the crime, it must be a direct movement

toward commission of the offense. *Manual of Court-Martials*, Part IV, ¶ 4(c)(2), pp 4-5 (1984).

The defendant's prior conviction by General Court Martial may act as the prior felony supporting this aggravating circumstance. The N.C.G.S. § 15A-2000(e)(3) aggravating circumstance is not limited to felonies that occur in North Carolina, but includes acts by the defendant that would be considered a felony if they occurred in North Carolina. *See State v. Taylor*, 304 N.C. 249, 279, 283 S.E.2d 761, 780, *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983) (Virginia conviction for rape admissible because defendant was convicted of what would be considered a felony in North Carolina). Rape is a felony under North Carolina law (N.C.G.S. § 14-27.2 and N.C.G.S. § 14-27.3), as is attempted rape (N.C.G.S. § 14-27.6). Therefore, the attempted rape the defendant was convicted of is classified as a felony in North Carolina. Further, the defendant concedes that attempted rape is a felony under military law.

Under the Uniform Code of Military Justice, rape is always, and under any circumstances, deemed as a matter of law to be a crime of violence. *United States v. Bell*, 25 M.J. 676 (A.C.M.R. 1987), *rev. denied*, 27 M.J. 161 (C.M.A. 1988); *United States v. Myers*, 22 M.J. 649 (A.C.M.R. 1986), *rev. denied*, 23 M.J. 399 (C.M.A. 1987). As stated in *Myers*, military courts "specifically reject the oxymoronic term of 'non-violent rape.' The more enlightened view is that rape is always a crime of violence, no matter what the circumstances of its commission." *Myers*, 22 M.J. at 650. "Among common misconceptions about rape is that it is a sexual act rather than a crime of violence." *United States v. Hammond*, 17 M.J. 218, 220 N.3 (C.M.A. 1984). This Court likewise has stated that rape is inherently a crime of violence. *State v. Artis*, 325 N.C. 278, 321, 384 S.E.2d 470, 494 (1989), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

When, as here, the prior felony conviction supporting this aggravating circumstance is one deemed inherently violent under the law of the jurisdiction in which it was committed, the details of the commission of that felony need not be established. *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981). Attempting to commit a crime which inherently involves violence obviously constitutes, at least, a "threat of violence." *See* N.C.G.S. § 15A-2000(e)(3) (1988). Thus the defendant's conviction under military law of at-

empted rape is a conviction for a prior felony involving at minimum the "threat of violence."

The defendant contends that *dicta* in *McDougall* supports the proposition that non-violent rape and attempted rape—not involving the use or threat of force—may occur under North Carolina law. *But see State v. Artis*, 325 N.C. at 321, 384 S.E.2d at 494 (1989). Since the military courts have held all rapes to be crimes of violence under military law, and all attempts to commit rape therefore by definition involve the use or threat of force, we need not and do not consider whether there is a non-violent crime of attempted rape under North Carolina law.

The evidence presented concerning the prior felony was proper and sufficient to establish that the defendant had been convicted of a prior felony involving the use or threat of violence to the person. Rape is always deemed a crime of violence under military law. The felony of attempt to commit rape is therefore by nature of the crime a felony which threatens violence. *See, e.g., Woodruff v. State*, 846 P.2d 1124 (Okla. Crim. App.), *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 313 (1993) (Defendant's stipulation to prior convictions for two counts of solicitation to commit murder was sufficient evidence in itself to support the aggravator that the defendant "had previously been convicted of a felony involving the use or threat of violence to the person"). This assignment of error is therefore overruled.

By another assignment of error the defendant contends that the trial court incorrectly charged the jury that in considering this aggravating circumstance, attempted rape constitutes a crime of violence or threat of violence as a matter of law. The defendant contends that the instruction constituted an impermissible expression of opinion by the trial court and that it also constituted an improper conclusive presumption. Because, as we have demonstrated, attempted rape is a crime of violence under military law, the trial court correctly instructed the jury. This did not constitute an improper expression of opinion. *State v. Torain*, 316 N.C. 111, 340 S.E.2d 465, *cert. denied*, 479 U.S. 836, 93 L. Ed. 2d 77 (1986). Further, the trial court's instruction did not constitute an impermissible conclusive presumption, as the instruction permitted the jury to make the factual determination as to whether the defendant had been convicted. *Artis*, 325 N.C. 320-22, 384 S.E.2d 494. For these reasons, this assignment of error is overruled.

STATE v. GREEN

[336 N.C. 142 (1994)]

**[9]** By another assignment of error, the defendant contends that the trial court erred in failing to strike the plea agreements *ex mero motu* in this case in which the State accepted pleas of guilty to felony murder only. The defendant contends that this plea agreement is contrary to principles set forth in *State v. Case*, 330 N.C. 161, 410 S.E.2d 57 (1991). Because the plea agreement was proper and did not have the effect of suppressing an aggravating circumstance supported by the evidence, we disagree.

In this case, the prosecutor permitted the defendant to plead guilty to two counts of first-degree murder "based solely upon the felony murder rule and theory," even though the evidence supported other theories of first-degree murder. The plea bargain specified that the armed robbery charges were to be reduced to common law robbery and that the convictions for these robberies, in turn, would be merged with the first-degree murder convictions. As a result, the defendant would be sentenced only for two counts of first-degree murder.

We conclude that *Case* has no application to the present matter. In *Case*, the prosecutor, in exchange for the plea of guilty to first-degree murder, agreed that the State would present evidence of only one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel. However, the evidence would also have supported submission of the aggravating circumstances that the defendant committed the murder while engaged in the commission of a kidnapping and that the defendant committed the murder for pecuniary gain. N.C.G.S. §§ 15A-2000(e)(5) and (6) (1988). The plea bargain in *this* case, by contrast, served only to limit the maximum time the defendant would serve in prison *if the jury failed to recommend a sentence of death*. This plea arrangement did not "suppress" an aggravating circumstance supported by evidence or otherwise limit the sentence the jury could recommend for first-degree murder.

Had the State not entered into the plea agreement, it could have gone to trial on the theories of felony-murder and premeditation and deliberation. Had the defendant been convicted of the first-degree murders pursuant to both theories, the number of available aggravating circumstances would have been no different than under the plea bargain at issue here. Absent the plea bargain, the evidence would have supported *either* N.C.G.S. § 15A-2000(e)(5), that the capital felony was committed in the course of a robbery,

*or* N.C.G.S. § 15A-2000(e)(6), that the capital felony was committed for pecuniary gain. This Court has held that the State may not rely on both of these aggravating circumstances when, as here, they are premised on one underlying robbery and the theory of first-degree murder relied on is premeditation and deliberation. *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), *judgment vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 288, 401 S.E.2d 632 (1991). The only effect of the plea bargain was to establish prior to the capital sentencing proceeding that pecuniary gain was the aggravating circumstance upon which the State intended to rely, not murder in the course of a robbery. Thus the total number of aggravating circumstances was unaffected by the plea agreement. This case is unlike *Case* in that respect.

Nor did the plea agreement lessen the seriousness of the offense. Premeditation and deliberation is a theory pursuant to which a defendant may be convicted of first-degree murder; felony murder is another such theory. Criminal defendants are not convicted or acquitted of theories; they are convicted or acquitted of crimes. *Shad v. Arizona*, 501 U.S. 624, 115 L. Ed. 2d 555, *reh'g denied*, --- U.S. ---, 115 L. Ed. 2d 1109 (1991); *State v. Thomas*, 325 N.C. 583, 593, 386 S.E.2d 555, 561 (1989). First-degree murder under one theory is not a lesser included offense of first-degree murder under the other theory. *State v. Lewis*, 321 N.C. 42, 361 S.E.2d 728 (1987). Rather, as noted in *Shad*, 501 U.S. at ---, 115 L. Ed. 2d at 573, these two theories of first-degree murder "reflect notions of equivalent blameworthiness or culpability." Thus this plea agreement did not violate the principles applied in *Case*, and this assignment of error is overruled.

**[10]** By another assignment of error the defendant contends that the trial court erred in failing to give peremptory instructions on the nonstatutory mitigating circumstance that the defendant had pled guilty to both murder charges. Because the requested instruction was inappropriate, the trial court properly denied the defendant's request.

The defendant requested that the trial court instruct the jury to consider and give weight to the nonstatutory mitigating circumstance that the defendant had pled guilty to the two murders. The instruction specifically requested was a North Carolina Pattern Jury Instruction which reads as follows:

The defendant has the burden of establishing this mitigating circumstance by the preponderance of the evidence, as I have explained to you.

Accordingly, as to this mitigating circumstance, I charge you that if one or more of you finds the facts as all the evidence tends to show, you will answer "yes" as to Mitigating Circumstance (read number) on the "Issues and Recommendation" form.

N.C.P.I. 150.11 (October 1991). It is uncontested that the defendant entered two pleas of guilty to first-degree murder pursuant to the felony-murder theory, as well as two pleas of guilty to common law robbery. However, this is evidence of a nonstatutory mitigating circumstance and therefore the requested instruction would have been wholly inappropriate.

This Court has held that as to a proffered *nonstatutory* mitigating circumstance — unlike statutory ones — the jurors must first find whether the proffered circumstance exists factually. Jurors who find that a nonstatutory mitigating circumstance exists are then to consider whether it should be given any mitigating weight. *State v. Hill*, 331 N.C. 387, 418, 417 S.E.2d 765, 780 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 684 (1993); *State v. Huff*, 325 N.C. 1, 58-61, 381 S.E.2d 635, 668-70 (1989), *sentence vacated*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577 (1991). Thus, a juror may find that a nonstatutory mitigating circumstance exists, but may give that circumstance no mitigating value.

We recognize that our opinions have not limited the application of peremptory instructions with regard to mitigating circumstances solely to statutory mitigating circumstances. *E.g., State v. Gay*, 334 N.C. 467, 434 S.E.2d 840 (1993). We have stated that: "A rule requiring peremptory instructions (where appropriate) only in regard to statutory mitigating circumstances could compromise the potential mitigating value of nonstatutory mitigating circumstances in contravention of the law of this State." *Id.* at 493, 434 S.E.2d at 855. However, nothing we stated in *Gay* supports the notion that the peremptory instructions to be used with regard to nonstatutory mitigating circumstances should be identical to those used with regard to statutory mitigating circumstances. To the contrary, we reemphasized in *Gay* that even if a jury finds from uncontroverted and manifestly credible evidence that a nonstatutory

**STATE v. GREEN**

[336 N.C. 142 (1994)]

mitigating circumstance exists, "jurors may reject the nonstatutory mitigating circumstance if they do not deem it to have mitigating value." *Id.* at 492, 434 S.E.2d at 854. It continues to be the law that before a juror "finds" a *nonstatutory* mitigating circumstance, he or she must make two preliminary determinations: (1) that the evidence supports the factual existence of the circumstance, *and* (2) that the juror deems the particular circumstance to have mitigating value in the case in question. *See Huff* at 59, 381 S.E.2d at 669 (decided prior to *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990) (holding a requirement of jury unanimity unconstitutional). It is this law which should be imparted to a jury when giving peremptory instructions on *nonstatutory* mitigating circumstances, rather than the information contained in North Carolina Pattern Jury Instruction 150.11 which relates to peremptory instructions with regard to *statutory* mitigating circumstances.

Where a defendant requests an instruction which is supported by the evidence and which is a correct statement of law, the trial court must give the instruction in substance. *Hill*, 331 N.C. at 420, 417 S.E.2d at 782. However, it would have been error for the trial court to have charged the jury peremptorily on the nonstatutory circumstance in the manner requested by the defendant. *Huff*, 325 N.C. at 60, 381 S.E.2d at 668. This assignment is without merit and is overruled.

[11] By his next assignment of error, the defendant contends that the trial court erred in instructing the jury that they "may" rather than "must" consider found mitigating circumstances. For example, the trial court instructed the jury with regard to Issue Three on the "ISSUES AND RECOMMENDATION FORM" as follows:

> Issue No. Three is: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?"

> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. *In deciding this issue, each juror may consider any mitigating circumstance or circumstances that the juror determined to exist by a preponderance of the evidence in Issue No. 2.* And in so doing, you are the sole judges of the weight to be given to any individual circumstance which you find, whether aggravating

or mitigating. You should not merely add up the number of aggravating circumstances and mitigating circumstances. Rather, you must decide from all the evidence what value to give each circumstance, and then weigh the aggravating circumstances so valued against the mitigating circumstances so valued, and finally determine whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances.

If you unanimously find beyond a reasonable doubt that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer Issue Three, "Yes." If you do not so find, or a have a reasonable doubt as to whether they do, you would answer Issue Three, "No." If you answer Issue Three, "No", it would be your duty to recommend that the defendant be sentenced to life imprisonment. If you answer Issue Three, "Yes," you must consider Issue Four.

(Emphasis added.) The Defendant complains of and assigns error to the above italicized language.

The defendant contends that this instruction permitted the jurors to ignore the mitigating circumstances they had found. For this reason, the defendant contends that the instruction violated the Eighth Amendment and principles set forth in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). We have recently addressed and rejected arguments identical to those made by this defendant in support of this assignment of error. *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547 (1994). The defendant has demonstrated no reason why we should reverse or alter our recent precedent in this regard. Because we continue to believe that the instruction given here is correct and would be interpreted by any reasonable juror as meaning that all "found" mitigating circumstances must be considered, we conclude that the instruction given was not error. *Id.* This assignment of error is without merit and is overruled.

[12] By another assignment of error the defendant contends that the trial court's responses to jury messages misled the jury and coerced a recommendation of death. The defendant contends that the trial court, by a series of improperly coercive statements, violated his statutory and due process rights. Because, based upon the "totality of the circumstances" the statements were not coercive nor in violation of N.C.G.S. § 15A-1235, we disagree.

The jury was charged pursuant to the pattern jury instructions and sent to deliberate. After the jury deliberated for approximately three hours and fifteen minutes, the jury foreperson sent a note to the trial court. The note said: "Sir — we have a juror that does not believe in capital punishment — the questions asked in jury selection were not understood. She cannot think of any reason for the death penalty." (Emphasis in original.) In response to the note the trial court called the entire jury into the courtroom, identified the author, and said:

> All I can tell you is that the information reported in this note is a matter that cannot now be addressed, and you must continue your deliberations with a view to reaching an agreement, if you can, without violence to individual judgment. You can retire and continue your deliberations.

The defendant contends that the statement that the "matter . . . cannot now be addressed," implied that it was a matter that could and should be addressed by the trial court at some later time and thereby pressured a holdout juror to agree with the majority. Additionally, the defendant argues that the note accused a female juror of misconduct and that the trial court's subsequent instructions implied a future threat of punishment for this misconduct. We disagree.

Under applicable law, the "totality of the circumstances" test is applied in determining whether the trial court's actions have coerced a verdict thereby impinging on a defendant's right to jury trial. *State v. Bussey*, 321 N.C. 92, 96, 361 S.E.2d 564, 566-67 (1987); *State v. Fowler*, 312 N.C. 304, 322 S.E.2d 389 (1984). Here, the defendant's argument is not supported by the language of the note or the trial court's instructions. The trial court, by not reading the note aloud, insured that no juror would be embarrassed or pressured in open court. Further, when the jury was sent back to deliberate, the trial court emphasized that the deliberations should continue "without violence to individual judgment." Based upon the "totality of the circumstances" the trial court's comments in regard to the first note were not coercive.

[13] After deliberating further, the jury sent out a second note. This one asked: "Does [the jury] decision have to be unanimous on both recommendations?" In response, the trial court instructed as follows:

**STATE v. GREEN**

[336 N.C. 142 (1994)]

Ladies and gentlemen of the jury, the Court instructed you that for you to recommend that the defendant be sentenced to death in either or both of these cases, the State must prove three things beyond a reasonable doubt:

First, that one or more aggravating circumstances existed;

Second, that the mitigating circumstances are insufficient to outweigh any aggravating circumstances you have found; and

Third, that any aggravating circumstances you have found are sufficiently substantial to call for the imposition of the death penalty when considered with any mitigating circumstances.

If you unanimously find all three of these things beyond a reasonable doubt, it would be your duty to recommend that the defendant be sentenced to death. If you do not so find, or if you have a reasonable doubt as to one or more of these things, in either or both of these cases, it would be your duty to recommend that the defendant be sentenced to life imprisonment.

I hope that answers your question—Does your decision have to be unanimous on both recommendations?

All right. You may retire and continue your deliberations.

After these instructions, the jury was returned to the jury room for further discussion.

The trial judge, on his own motion, then called the jury back to the court room and the following took place:

THE COURT: Miss Ross, just answer this question either yes or no.

MR. HAIGWOOD: Excuse me, Judge.

THE COURT: Excuse me. Again, Miss Ross, if you'll answer this question either yes or no. Has the jury arrived at a recommendation in either of the cases? That requires a yes or no. A unanimous recommendation in either of the cases, yes or no?

JUROR: Unanimous in either, no, sir.

THE COURT: Well, let me address the question that you gave me a few minutes ago a little bit further.

STATE v. GREEN

[336 N.C. 142 (1994)]

The Court instructed you yesterday that you are required to consider each case separately in your making separate recommendations in each case. I told you that you could recommend — you could recommend death in both cases, or you could recommend death in one case and life imprisonment in the other, or that you could recommend life imprisonment in both cases, but whatever recommendation you make, must be unanimous.

The defendant's objection to this instruction was overruled. The jury then retired to deliberate.

The defendant contends that this statement by the trial court was error of the magnitude found to be reversible in *State v. Smith*, 320 N.C. 404, 358 S.E.2d 329 (1987). This case is distinguishable from *Smith* in two distinct and dispositive ways. First, in *Smith*, the jury asked, "If the jurors' decision is not unanimous, is this automatic life imprisonment or does the jury have to reach a unanimous decision regardless?" 320 N.C. at 420, 358 S.E.2d at 338. This Court held that the particular instruction in response to the specific inquiry in *Smith "probably conveyed* the erroneous impression that a unanimous decision, either for death or for life imprisonment, was required." *Smith*, 320 N.C. at 422, 358 S.E.2d at 339 (emphasis added). In *Smith*, we held that when a jury specifically *inquires as to the result should it fail to reach a unanimous recommendation as to a sentence,* "the trial court must inform the jurors that their inability to reach a unanimous verdict should not be their concern but should simply be reported to the court." *Id.* Here, the jury did not inquire as to what would result if it failed to reach a sentencing recommendation, but merely inquired as to whether it must be unanimous to make such a recommendation. The trial court correctly informed that jury that any recommendation they made as to sentencing must be unanimous. *See* N.C.G.S. § 15A-2000(b) (1988).

Second, unlike the situation we dealt with in *Smith*, we are not required to speculate here as to whether the instructions were misleading or led to a coerced verdict. Eighteen minutes after the trial court gave the complained-of instructions, the jury was brought into the courtroom in response to another note to the court. The following proceedings took place:

THE COURT: Madam foreman, your bailiff has handed me a note, I take it it's from you, that says 'We're unable to

reach a unanimous decision on either case.' Is that your report to the Court?

JUROR: Yes, sir.

The trial court then gave a supplemental instruction directing the jury to continue its deliberations. From this we are able to say that the jury, unlike the jury in *Smith*, was not misled and that the jurors clearly understood that they could report back to the court that they were unable to reach a unanimous decision in either case. In fact this is exactly what they did at this point.

The context in which the trial court's instructions were given in the case *sub judice* therefore differed radically from that in *Smith*. "The lesson in *Smith* is that, in telling a jury that its recommendation as to punishment must be unanimous, the trial court must be vigilant to inform the jurors that whatever recommendation they *do* make must be unanimous and not to imply that a recommendation *must* be reached." *State v. Price*, 326 N.C. 56, 92, 388 S.E.2d 84, 105 (1990) (emphasis in original). The instructions given in the present case correctly stated the law as established by N.C.G.S. § 15A-2000(b) and did not mislead the jurors into thinking that they must in all events deliberate until they could return a unanimous recommendation of life imprisonment or death.

[14] Additionally, the defendant assigns error to the instruction given to the jury following its receipt of the note from the foreperson indicating the jury's inability to reach a unanimous recommendation. The trial court gave an instruction substantially similar to the legislatively approved version of the *Allen* charge. *See Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528 (1896); N.C.G.S. § 15A-1235 (1983). The trial court instructed as follows:

THE COURT: Ladies and gentlemen of the jury, let me say this to you. All of us have a considerable amount of time in this case. I know that you have been diligent in your deliberations.

As I told you yesterday, it is your duty to decide from the evidence what the facts are, and you must then follow the law which I gave you concerning punishment as to those facts. This is important, because justice requires that everyone who is sentenced for first degree murder has the sentence recommendation determined in the same manner and have the same law applied to him.

It is your duty to reason the matters over together as reasonable men and woman, to listen to one another's viewpoints and to deliberate with a view to reaching an agreement without violence to individual judgment. Each of you must decide the case for yourself but only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, each of you should not hesitate to reexamine your own views and change your opinion if it is erroneous. I caution each of you not to surrender your honest convictions as to the weight or effect of the evidence, or do violence to your conscience, or compromise to your convictions solely because of the opinions of your fellow jurors, or for the mere purpose of making a recommendation.

I'm going to ask you to continue on with your deliberations and see if you can arrive at a recommendation.

The defendant objected to the court's supplemental instruction. The court overruled the objection. One hour after the last supplemental instruction, the jury returned recommendations that the defendant be sentenced to death for both murders.

The defendant contends that this supplemental instruction to the jury was coercive. Specifically, the defendant complains that the trial court called the jury's attention to the fact that "[a]ll of us have a considerable amount of time in this case." This argument is meritless.

"[I]t has long been the rule in this State that in deciding whether a court's instructions force a verdict or merely serve as a catalyst for further deliberations, an appellate court must consider the circumstances under which the instructions were made and the probable impact of the instructions on the jury." *State v. Peek*, 313 N.C. 266, 271, 328 S.E.2d 249, 253 (citing *State v. Alston*, 294 N.C. 577, 243 S.E.2d 354 (1978)). The sentence complained of, when read in conjunction with the next sentence of the instructions — "I know you have been diligent in your deliberations" — simply suggested to the jury that they had devoted a substantial amount of time to the defendant's cases, that they were to be commended for their diligence, and that they should continue to deliberate if a recommendation was possible. Further, throughout the charge the trial court continually reminded the jurors to avoid "violence to individual judgment," "decide the case for yourself," and "not to

STATE v. GREEN

[336 N.C. 142 (1994)]

surrender your honest convictions . . . *for the mere purpose of making a recommendation.*" (Emphasis added.) Although the supplemental instructions did not precisely follow the guidelines set forth in N.C.G.S. § 15A-1235, the essence of the instructions was merely to ask the jury to continue to deliberate. *Price*, 326 N.C. at 91, 338 S.E.2d at 104; *see also State v. Huff*, 325 N.C. 1, 64-65, 381 S.E.2d 635, 672-73 (1989).

[15] Next, the defendant complains that the trial court erred in including in its supplemental instructions the following:

> As I told you yesterday, it is your duty to decide from the evidence what the facts are, and you must then follow the law which I gave you concerning punishment as to these facts. This is important, because justice requires that everyone who is sentenced for first degree murder has the sentence recommendation determined in the same manner and have the same law applied to him.

The defendant contends that a reasonable juror, in the context of this case and the trial court's other instructions, would likely interpret this part of the charge as meaning that the law requires unanimity and jurors who are in disagreement are not "following the law." These remarks by the trial court which the defendant complains of merely reminded the jurors of their prior instructions. The remarks were followed almost immediately by the trial court's specific direction to jurors that they should not surrender their honest convictions or compromise their convictions "for the mere purpose of making a recommendation." The remarks were correct in every respect and were in no way coercive. The trial court did not err in this regard.

Applying the "totality of the circumstances" test, we conclude that the trial court's instructions did not coerce a jury recommendation. This assignment of error is therefore overruled.

[16] By another assignment of error the defendant contends that the trial court erred in denying his request to submit several nonstatutory mitigating circumstances for the consideration of the jury. We disagree.

Here, the defendant made a timely request that the trial court submit specified nonstatutory mitigating circumstances for the jury's consideration. He now assigns error to the trial court's refusal to do so.

In order for defendant to succeed on this assignment, he must establish that (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury. Upon such showing by the defendant, the failure by the trial judge to submit nonstatutory mitigating circumstances to the jury for its determination raises federal constitutional issues.

*State v. Benson*, 323 N.C. 318, 325, 372 S.E.2d 517, 521 (1988) (footnotes omitted).

The defendant in the present case requested in writing that the trial court submit the following nonstatutory mitigating circumstances for consideration by the jury:

That Harvey Lee Green, Jr. will continue to adjust well to prison life and be a model prisoner.

That Harvey Lee Green, Jr. was a quiet student in school and was not a discipline problem.

That Harvey Lee Green, Jr. did not commit the murders after premeditation and deliberation.

Harvey Lee Green, Jr. did not intend to take the life of Sheila Bland or John Michael Edmondson when he entered Young's Cleaners.

Harvey Lee Green, Jr. did not enter Young's Cleaners with the weapon which was used to take the lives of Sheila Bland and John Michael Edmondson.

The defendant first argues that the trial court erred in refusing to submit the mitigating circumstance that "Harvey Lee Green, Jr. will continue to adjust well to prison life and be a model prisoner." As the Supreme Court of the United States has explained, "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Skipper v. South Carolina*, 476 U.S. 1, 90 L. Ed. 2d 1 (1986). The evidence presented by the defendant in this case was sufficient to support submission of this circumstance, and a reasonable juror could have found it to be mitigating. Therefore, we must conclude that the trial court erred by refusing to submit this nonstatutory mitigating circumstance to the jury.

**STATE v. GREEN**

[336 N.C. 142 (1994)]

Our conclusion that the trial court erred does not end our consideration of this issue, however, because error in failing to submit a nonstatutory mitigating circumstance is subject to harmless error analysis. *State v. Hill*, 331 N.C. 387, 416, 417 S.E.2d 765, 779 (1992). As we have often pointed out, "[w]hether a violation of a defendant's federal constitutional rights is prejudicial is controlled by N.C.G.S. § 15A-1443(b). Such violation is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1993). The burden is upon the state to so prove." *Benson*, 323 N.C. at 326, 372 S.E.2d at 521. Assuming *arguendo* that this error by the trial court amounted to constitutional error under *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), we nevertheless conclude that the State has carried the burden of showing that it was harmless beyond a reasonable doubt.

The trial court submitted the circumstance that "[t]he defendant was an above average inmate and good worker while incarcerated at Fort Levenworth" and the circumstance that "[t]he defendant has been a model prisoner and adjusted well while incarcerated for these offenses." All of the jurors rejected both the defendant's present "model prisoner" status and his prior "model prisoner" status at Fort Levenworth as circumstances in mitigation of these crimes. All of the evidence tending to support the requested nonstatutory mitigating circumstance which was not submitted— that the defendant "will continue to adjust well to prison life and be a model prisoner"—was considered by the jury under those submitted but rejected mitigating circumstances as well as under the catch-all mitigating circumstance. The trial court's error in failing to submit the defendant's requested nonstatutory mitigating circumstance was harmless here, where it is clear the jury was not prevented from considering any potential mitigating evidence. *Hill*, 331 N.C. at 417, 417 S.E.2d at 780. At least two of the circumstances provided a vehicle for the jury to consider defendant's ability to adjust well to prison life in the future. The proposed nonstatutory mitigating circumstance was subsumed in the circumstances that were presented. *See Benson*, 323 N.C. at 327, 372 S.E.2d at 521-22. Accordingly, we conclude that the State has shown that the trial court's failure to submit this nonstatutory mitigating circumstance was harmless beyond a reasonable doubt.

[17] The defendant next argues in support of this assignment that it was error for the trial court to fail to submit the nonstatutory

mitigating circumstance that the defendant "was a quiet student in school and was not a discipline problem." This circumstance was not supported by the evidence, and the trial court was correct in refusing to submit it to the jury. While it is true that two of the defendant's former teachers testified that the defendant had been "quiet" and "wasn't any problem in class," it was uncontroverted that the defendant was expelled from high school due to fighting and for that reason joined the Army. Given this uncontested fact, we conclude that no reasonable juror could have found that he "was not a discipline problem in school." The trial court correctly refused to submit this circumstance to the jury.

[18] The defendant next argues in support of this assignment that the trial court erred in failing to submit the nonstatutory mitigating circumstance that he did not kill after premeditation and deliberation. We disagree.

This Court has previously defined a mitigating circumstance as follows:

A definition of mitigating circumstance approved by this Court is a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first-degree murder, but which may be considered as extenuating, or reducing the moral culpability of the killing or making it less deserving of the extreme punishment than other first-degree murders.

*State v. Irving*, 304 N.C. 93, 104, 282 S.E.2d 439, 446-47 (1981) (citing *State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 (1981)). The fact that the defendant pled guilty to the first-degree murders under the felony murder theory and was neither tried nor convicted of those crimes on the theory of premeditation and deliberation is not mitigating. The felony murder theory of the crime of first-degree murder, pursuant to which the defendant entered two pleas of guilty, is not a different crime than first-degree murder by premeditation and deliberation. *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989). Rather, these two theories by which one may be found to have committed murder in the first degree "reflect notions of equivalent blameworthiness or culpability." *Shad v. Arizona*, 501 U.S. 624, ----, 115 L. Ed. 2d 555, 573 (1991). The absence of an alternative theory for establishing that a murder was murder in the first degree cannot be considered mitigating in a capital sentencing proceeding.

Moreover, the State does not have the burden of proving that any mitigating circumstance does not exist. *State v. Brown*, 306 N.C. 151, 178, 293 S.E.2d 569, 586, *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982). Instead, a mitigating circumstance must be established by evidence and to the satisfaction of the jury. *Hutchins*, 303 N.C. at 356, 279 S.E.2d at 809. Our review of the record discloses no evidence tending to show that the defendant did not act with premeditation and deliberation. On the other hand, evidence was introduced which supported the premeditation and deliberation theory of first-degree murder. Given the evidence of attempted strangulation of Sheila Bland and the multiple blows administered in the beating of the two victims to death, we simply find no evidence supporting submission of this nonstatutory mitigating circumstance.

[19] Finally, the defendant contends in support of this assignment that the trial court erred in refusing to submit as possible nonstatutory mitigating circumstances that (1) the defendant did not intend to take the life of Sheila Bland or John Michael Edmondson when he entered Young's Cleaners, and (2) the defendant did not enter Young's Cleaners with the weapon which was used to take the lives of the victims. Self-serving portions of a statement the defendant made to the police—although controverted by most of the substantial evidence in the record—did tend to support these two requested nonstatutory mitigating circumstances. Further, a reasonable juror could find such circumstances to be mitigating. Therefore, the trial court erred in failing to submit them for the jury's consideration. *Benson*, 323 N.C. at 325, 372 S.E.2d at 521. That violation must be deemed prejudicial unless the State bears its burden of showing that the error was harmless beyond a reasonable doubt. *Id.* at 318, 372 S.E.2d at 517.

In the present case, the evidence tending to show these two requested nonstatutory mitigating circumstances was fully argued to and impressed upon the jury by counsel for the defendant during their closing arguments. The jurors must have considered all of this evidence when they considered and in fact found the catch-all mitigating circumstance, properly submitted by the trial court pursuant to N.C.G.S. § 15A-2000(f)(9), and again when they considered and found the mitigating circumstance that "the defendant was under the influence of mental or emotional disturbance" at the time he committed the murders. Accordingly, the error of the trial court here did not preclude any juror from considering and giving

weight to any mitigating evidence. *See Hill*, 331 N.C. at 417, 417 S.E.2d at 780. Therefore, we conclude that the State has carried its burden of proving that the trial court's error was harmless beyond a reasonable doubt.

For the foregoing reasons, we reject the defendant's arguments in support of this assignment of error. The assignment of error is without merit and is overruled.

[20] By another assignment of error, the defendant contends that he was denied a fair capital sentencing proceeding due to the prosecutor's improper comments to the jury. The defendant argues that the prosecutor's closing argument contained statements which tended to inflame the jury and misstate the applicable law and which had no evidentiary basis in the record.

Trial counsel are allowed wide latitude in jury arguments. *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). Counsel are permitted to argue the facts based on evidence which has been presented as well as reasonable inferences which can be drawn therefrom. *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986). Control of closing arguments is in the discretion of the trial court. *State v. Zuniga*, 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). Additionally, as this Court has previously pointed out, "for an inappropriate prosecutorial comment to justify a new trial, it 'must be sufficiently grave that it is prejudicial error.'" *Soyars*, 332 N.C. at 60, 418 S.E.2d at 487-88 (quoting *State v. Britt*, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977)). In order to reach the level of "prejudicial error" in this regard, it now is well established that the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157, *reh'g denied*, 478 U.S. 1036, 92 L. Ed. 2d 774 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 40 L. Ed. 2d 431 (1974)). In the present case, the defendant argues that several portions of the prosecutor's closing argument amounted to such "prejudicial error." We address each of the defendant's contentions individually.

The defendant first contends that the prosecutor misstated the law in making the following argument:

Now, your deciding, you know, does he get life or does he get death. If he kills one, he gets life. Does he get life on

the second one, too? Two for the price of one. That's why we say that if you kill one or two people, or hurt one and kill one, that's an aggravating circumstance. Life is life. And to come back and to give this man life imprisonment in either one of these cases or both of these cases, you're giving him two for the price of one.

The defendant contends that this argument was a misstatement of the law because the prosecutor knew that there was the possibility that the defendant would suffer additional punishment for a second life sentence as a result of having his parole eligibility date extended from twenty years to forty years. He further argues that this argument denied him due process and, thus, amounted to prejudicial error. We disagree.

The argument complained of here appears to have been properly directed to the question of the weight the jury should give the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11), and the prosecutor's reasons for contending that the jury should deem that aggravating circumstance sufficient to warrant the penalty of death rather than life imprisonment. Assuming *arguendo*, however, that the argument was improper, we conclude that it could not have been prejudicial in the present case. We note that counsel for the defendant had made similar statements during their questioning of jurors during jury selection. On several occasions the defendant's counsel told the prospective jurors that their decision would be between death and the defendant spending the rest of his life in prison. The defendant having so characterized a life sentence to the jury, cannot complain that he has been denied due process by the prosecutor's action in doing precisely the same during his closing argument to the jury.

[21] The defendant next argues that other comments by the prosecutor tended to diminish the jury's responsibility during his capital sentencing proceeding in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231 (1985), *judgment vacated on other grounds*, 479 U.S. 1075, 94 L. Ed. 2d 130 (1987). The prosecutor argued to the jury that "[t]he form tells you, from your answers, whether he should be sentenced to life or death. You're not deciding on the sentence. You're deciding on the factors and you're weighing the factors." No objection was made to this portion of the prosecutor's argument during the capital sentencing proceeding.

> In capital cases, however, an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). The standard of review, therefore, is one of "gross impropriety." *State v. Craig*, 308 N.C. 446, 454, 302 S.E.2d 740, 745, *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983).

In *Caldwell*, the Supreme Court of the United States held that it is unconstitutional to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. 478 U.S. at 328, 86 L. Ed. 2d at 239. However, statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal. Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred. Further, it must be remembered that the prosecutor in a capital case has a duty to strenuously pursue the goal of persuading the jury that the facts of the particular case at hand warrant imposition of the death penalty. *State v. Myers*, 299 N.C. 671, 680, 263 S.E.2d 768, 774 (1980); N.C.G.S. § 15A-2000(a)(4) (1988).

After the remarks complained of here, the prosecutor went on to say, "It's not easy. No matter how hard it is to you, somebody, sometime, has got to make these decisions, and this time it's you." Additionally, the prosecutor told the jury that "somebody's got to stand up and say, I'm responsible. I will follow the law, no matter how hard it is. And no matter if I don't sleep tonight, I'll follow the law." North Carolina General Statute § 15A-2000(b) provides that in capital cases "[a]fter hearing the evidence, argument of counsel, and instructions of the court, the jury shall deliberate and render a sentence recommendation to the court. . . ." N.C.G.S. § 15A-2000(b) (1988). When taken in context, the closing argument of the prosecutor clearly and properly stated to the members of the jury that the ultimate responsibility for a sentencing decision

rested with them and with no one else. This argument is without merit.

[22] The defendant next complains that the prosecutor made several disparaging references to the defendant's status as a model prisoner and to the fact that the defendant was attending college. The defendant contends that there was no reason for these arguments except to unfairly "smear the defendant."

The prosecutor argued that the victims were "dead and buried." But "the defendant, 3180 days later, still sitting around here in a coat and tie, got the run of the Central Prison. You heard that didn't you? Got the run of Central Prison, and we're sending him to college. Maybe [Sheila Bland] wanted to go to college." Next the prosecutor argued that the jury should not consider the fact that the defendant was a good inmate because, "I mean, should he have the benefit of nine years in prison to clean up his act, come to court and be tried?"

The defendant did not object to these arguments at trial. Nevertheless, the defendant argues that the prosecutor's remarks were so grossly improper that the trial court was required to intervene *ex mero motu*. We do not agree.

The defendant requested and the trial court submitted the nonstatutory mitigating circumstance that the defendant had been a "model prisoner." The prosecutor was merely rebutting this circumstance with the argument that the defendant's "model prisoner" behavior was in anticipation of the sentencing hearing. Further, the defendant's counsel had argued that the jury should consider the worth of the courses the defendant was taking, the defendant's "model prisoner" status and the hardship of imprisonment on the defendant for "the rest of his life." The prosecutor's comments were direct responses to specific arguments made by counsel for the defendant and were in no way improper.

[23] Finally, the defendant argues in support of this assignment that the prosecutor improperly asked the jurors to put themselves in the place of the victims. The prosecutor argued, without objection by the defendant, that:

Sheila Bland was in there working, minding her own business, not hurting anybody, with no hostility or malice toward Harvey Lee Green, Jr., with no bad thoughts against Harvey Lee Green, Jr. All she wanted was to work and go home at 6:00;

and Mike Edmondson, not knowing Harvey Lee Green, Jr., all he wanted to do was to get through with church practice and get his clothes, like we all do. It wasn't some juke joint, drunk, raising cain. They weren't downtown trying to buy drugs or in the country or somewhere. They weren't out at 4:00 in the morning. *They were the same place you and I might be at 6:00. How many times do we go to the cleaners in our lifetime?* And that's the bottom line. You think about it.

If any one of those mitigating circumstances in any way offset the fact that those two people, under those circumstances, were brutally, without mercy, murdered — they had no charges filed against them. They had no trial. They had no lawyers defending them. There was no jury there to decide their fate. *Harvey Lee Green, Jr., charged them, prosecuted them, convicted them, and executed them for doing what you and I do every day.*

(Emphasis added.)

An argument "asking the jurors to put themselves in place of the victims will not be condoned. . . ." *State v. McCollum,* 334 N.C. 208, 224, 433 S.E.2d 144, 152 (1993) (quoting *United States v. Picknarcek,* 427 F.2d 1290, 1291 (9th Cir. 1970)). However, this is not what occurred in this case. The prosecutor did not ask the jurors to place themselves in the victims' place. Rather the prosecutor emphasized that the victims' behavior did not invite attack, they were not at a place where an attack could be reasonably anticipated, and they were not careless. They were merely engaging in activity common to all humanity. This argument was not so grossly improper as to require the trial court to intervene *ex mero motu.*

For the foregoing reasons, we conclude that the arguments of the prosecutor during the capital sentencing proceeding in this case, which are the subject of this assignment of error, did not create prejudicial error. Accordingly, this assignment of error is overruled.

[24] The defendant contends by another assignment of error that the trial court erred in denying his motion for allocution. The defendant argues that this was harmful because it denied him his right to offer evidence in mitigation to show his remorsefulness. He contends he was entitled to do this by personally making un-

sworn statements of fact to the jury without cross-examination during the closing arguments. Because there is no common law, statutory, or constitutional right to allocution in a capital case, we disagree.

At common law, the defendant in a felony case had a right, called "allocution," to be asked formally and to state whether he had "anything to offer why judgment should not be given against him." *See Anonymous*, 3 Mod. 265, 266, 87 Eng. Rep. 175 (1689); *Rex & Regina v. Geary*, 2 Salk. 630, 91 Eng. Rep. 532 (1689). However, since the common law judge generally had no discretion as to the quantum of punishment in felony cases, the point of this question to the defendant was not to elicit mitigating evidence, but to give the defendant a formal opportunity to present one of the strictly defined common law grounds which required the avoidance or delay of sentencing — he was not the person convicted, he had the benefit of clergy, he was insane, or, if a woman, she was pregnant. *See generally* 1 Joseph Chitty, The Criminal Law *698, *761-*62 (1841). These were the only allocutory pleas reported in common law cases. *See* Paul W. Barrett, Allocution, 9 Mo. L. Rev. 120-21 (1944).

The practice of allocution has been followed to varying degrees in many American jurisdictions, although in some the practice is regarded as "having no more than a ceremonial character because of the safeguards which modern criminal procedure now provides to the defendant." *People v. Gaines*, 88 Ill.2d 342, 430 N.E.2d 1046, *cert. denied*, 456 U.S. 1001, 73 L. Ed. 2d 1295 (1982); *see also* A.G. Barnett, Annotation, *Necessity and Sufficiency of Question to Defendant as to Whether He Has Anything to Say Why Sentence Should not be Pronounced Against Him*, 96 A.L.R.2d 1292 (1964). Common law allocution has long been part of this State's jurisprudence. However, in *State v. Johnson*, 67 N.C. 55 (1872), this Court reiterated that the purpose of common law allocution was to present legal grounds why sentence ought not be pronounced. *Johnson*, 67 N.C. at 60. *Johnson* does not suggest that the common law right of allocution has ever permitted the defendant, unsworn, to make statements of fact to the jury. When Johnson was tried for rape in 1872, the death penalty was mandatory for rape convictions. Thus, any right of allocution after the verdict and prior to the judgment and sentence could not have been directed to mitigation, but only to legal error.

STATE v. GREEN

[336 N.C. 142 (1994)]

Further, this limited common law right has been modified by statute as it relates to noncapital offenses in North Carolina. In N.C.G.S. § 15A-1334, the legislature has dealt with a defendant's right to address the court in noncapital cases as follows:

(b) The defendant at hearing may make a statement ·on his own behalf. The defendant and prosecutor may present witnesses and arguments on the facts relevant to the sentencing decision and may cross-examine the other party's witnesses. No person other than the defendant, his counsel, the prosecutor, and one making a presentence report may comment to the court on sentencing unless called as a witness by the defendant, the prosecutor, or the court.

N.C.G.S. § 15A-1334 (1988). This statute is, by its own terms, restricted to noncapital cases. Section (d) of the statute states: "Sentencing in capital cases is governed by Article 100 of this Chapter." Thus, N.C.G.S. § 15A-1334 — not a part of Article 100 — has no application to capital sentencing proceedings which are conducted pursuant to N.C.G.S. § 15A-2000. For the foregoing reasons, we conclude that the only remanent of the common law right of allocution remaining in capital cases is the right to present strictly legal arguments to the presiding judge as to why no judgment should be entered.

·A defendant does not have a right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding. "The State and the defendant *or* his counsel shall be permitted to present argument for or against sentence of death. The defendant *or* defendant's counsel shall have the right to the last argument." N.C.G.S. § 15A-2000(a)(4) (1988) (emphasis added). However, the defendant has no right to testify without being subjected to cross-examination or to make unsworn statements of fact during any such argument or otherwise. There are no provisions in Article 100 of Chapter 15A which intimate any further right to allocution in capital cases exists than that contained in the common law and expressed in *Johnson.*

Further, in *McGautha v. California*, 402 U.S. 183, 28 L. Ed. 2d 711, *mandate stayed*, 403 U.S. 951, 29 L. Ed. 2d 862 (1971), *reh'g denied*, 406 U.S. 978, 32 L. Ed. 2d 677 (1972), discussing whether there is a constitutional right to allocution in a capital case, the Supreme Court stated that courts may require defendants to speak to the jury exclusively through sworn testimony subject to cross-

examination. 402 U.S. at 220, 28 L. Ed. 2d at 734; *see also Hill v. United States*, 368 U.S. 424, 7 L. Ed. 2d 417, *reh'g denied*, 369 U.S. 808, 7 L. Ed. 2d 556 (1962) (failure of a sentencing judge to ask a defendant whether he has anything to say prior to sentencing was not an error of constitutional significance). A failure to ask a convicted person whether he has anything to say before sentence is pronounced, alone, does not constitute grounds for a new trial or require a reversal of the verdict. *McGrady v. Cunningham*, 296 F.2d 600, 603 (4th Cir. 1961), *cert. denied*, 369 U.S. 855, 8 L. Ed. 2d 14 (1962). The constitution does not mandate a right of allocution in the form of unsworn testimony without cross-examination such as the defendant sought to introduce here. *See People v. Nicolaus*, 54 Cal. 3d 551, 817 P.2d 893 (1991); *State v. Hoyt*, 47 Conn. 518 (1880); *Dutton v. State*, 123 Md. 373, 91 A. 417 (1914); *Warner v. State*, 56 N.J.L. 686, 29 A. 505 (1894); *cf. Green v. United States*, 365 U.S. 301, 5 L. Ed. 2d 670 (1961) (must give defendant opportunity to present evidence in mitigation based on Federal Rules of Criminal Procedure Rule 32(a)).

The defendant contends a federal circuit court case sheds light on the issue. In *Ashe v. North Carolina*, 586 F.2d 334, 336 (4th Cir. 1978), *cert. denied*, 441 U.S. 966, 60 L. Ed. 2d 1072 (1979), a noncapital case, the court held that: [W]hen a defendant effectively communicates his desire to the trial judge to speak to the imposition of sentence, it is a denial of due process not to grant the defendant's request." *Ashe*, 586 F.2d at 336. However, the sentencing proceeding in a capital case is unlike any stage in noncapital cases. The defendant in a capital case may testify as to what penalty he feels is appropriate. He is allowed to present evidence as well as take the stand and testify before the jury that will recommend his sentence. Given this, we fail to see the need, much less a constitutional requirement, for a corresponding right of a defendant to make unsworn factual assertions to the jury during a capital sentencing proceeding without being subject to cross-examination.

This defendant had an opportunity to testify during the capital sentencing proceeding. Relying on his Fifth Amendment rights, the defendant waived his opportunity to testify before the jury concerning his remorsefulness. The common law right of allocution, to the extent it has not been abrogated by the passage of N.C.G.S. § 15A-2000 and § 15A-1334, lends no support to a defendant's request to make unsworn factual assertions to the jury. This assignment of error is without merit and is overruled.

By other assignments of error, the defendant has presented issues which he correctly acknowledges have previously been decided by this Court contrary to his position, but which he nonetheless brings forward in order to preserve them for possible further appellate review. We acknowledge that those assignments are properly preserved, but as we have previously found the issues raised by them to be without merit we do not address them here.

[25] Having concluded that the defendant's guilty pleas and capital sentencing proceeding were free from prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. We have thoroughly examined the record, transcripts, and briefs in the present case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

In conducting proportionality review, we determine whether "the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 354, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983); N.C.G.S. § 15A-2000(d)(2) (1983).

> In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). The pool of available cases from which those roughly similar with regard to the crime and the defendant may be drawn for comparison purposes has been defined as

> *All cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the

> jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Williams*, 308 N.C. at 79, 301 S.E.2d at 355 (emphasis in original). "The pool, however, includes only those cases which this Court has found to be free of error in both phases of the trial." *State v. Stokes*, 319 N.C. 1, 19-20, 352 S.E.2d 653, 663 (1987).

In the present case, the defendant pled guilty to two counts of first-degree murder upon the theory of felony murder. As to each murder, the jury found: (1) that the murder was part of a course of conduct by the defendant which included the commission by the defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11); (2) that the defendant had previously been convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); and (3) that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). As to each of the murders, the jury found as mitigating circumstances: (1) that the murder was committed while the defendant was under the influence of mental or emotional disturbance; (2) that the defendant, prior to his arrest, cooperated with law enforcement officers; (3) that the defendant confessed his crimes to law enforcement officers; (4) that the defendant, after his arrest, cooperated with law enforcement officers; (5) that the defendant provided financial assistance to his family while he was in the army; (6) that the defendant's parents divorced while he was a teenager; (7) the catch-all mitigating circumstance of any other circumstance arising from the evidence which one or more of the jurors deemed to have mitigating value.

In our proportionality review, we must compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *McCollum*, 334 N.C. at 240, 433 S.E.2d at 162. This case is not particularly similar to any case in which this Court has found the death penalty disproportionate and entered a sentence of life imprisonment. Each of those cases is distinguishable from the present case.

In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), the evidence tended to show that the defendant hid in the bushes at a bank and waited for the victim to make a night deposit. When the victim arrived, the defendant demanded the money bag. The victim hesitated, and the defendant fired a shotgun striking him in both legs. The victim later died of cardiac arrest caused by

the loss of blood from the shotgun wounds. The jury found only the aggravating circumstance of murder for pecuniary gain. *Benson* is easily distinguishable from the present case. Here, in addition to the pecuniary gain aggravating circumstance, the jury also found both the aggravating circumstance that the defendant committed each of the murders while engaged in other crimes of violence against another person or persons and the aggravating circumstance that the defendant had previously been convicted of a felony involving the use or threatened use of violence to the person. Further, the defendant in the present case committed two murders rather than a single murder such as that committed by the defendant in *Benson*.

In *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), the defendant and several others planned to rob the victim's place of business. During the robbery, one of the assailants beat the victim, killing him. *Stokes* is also easily distinguishable from the present case, however, because the jury in *Stokes* found only one aggravating circumstance, that the murder was especially heinous, atrocious or cruel. In the present case, the jury found three aggravating circumstances. Additionally, the defendant in the present case, unlike the defendant in *Stokes*, killed two victims rather than one.

In *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), the only aggravating circumstance found by the jury was that the murder for which the defendant was convicted was part of a course of conduct which included the commission of other crimes of violence against another person or persons. In the present case, the jury found that aggravating circumstance and two others. Also, the defendant in the present case murdered two victims, while the defendant in *Rogers* killed only one.

In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant and two companions went to the victim's home intending to rob and murder him. After gaining entry into the victim's home, the men killed him and stole his money. The jury found as aggravating circumstances that the murder was committed during the commission of a robbery or burglary and that it was committed for pecuniary gain. In concluding that the death penalty was disproportionate in *Young*, this Court focused on the failure of the jury in *Young* to find either the aggravating circumstance that the murder was especially heinous, atrocious, or cruel or the

aggravating circumstance that the murder was committed as part of a course of conduct which included the commission of violence against another person or persons. The present case is easily distinguishable from *Young* because, among other things, the jury found as an aggravating circumstance that the murder was committed as part of a course of conduct which included the commission of violence against another person. Additionally, the defendant in this case murdered two victims, unlike the defendant in *Young*.

In *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984), the single aggravating circumstance found by the jury was that the murder was committed against a law enforcement officer engaged in the performance of his official duties. In the present case, the jury found three entirely different aggravating circumstances. *Hill* is easily distinguishable from this case in which the defendant beat his male victim to death and strangled and beat his female victim to death.

In *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant was on foot and waved down the victim as the victim passed in his truck. Shortly thereafter, the victim's body was discovered in the truck. He had been shot twice in the head and his wallet was gone. The single aggravating circumstance found was that the murder was committed for pecuniary gain. *Jackson* is easily distinguishable from the present case in which the jury found two additional aggravating circumstances and in which the defendant murdered two victims, rather than one.

In *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983), the evidence tended to show that the defendant and a group of friends were riding in a car when the defendant taunted the victim by telling him that he would shoot him and by questioning whether the victim believed that the defendant would shoot him. The defendant shot the victim, but then immediately directed the driver to proceed to the emergency room of the local hospital. In concluding that the death penalty was disproportionate there, we focused on the defendant's immediate attempt to obtain medical assistance for the victim and the lack of any apparent motive for the killing. In contrast, the evidence in the present case tended to show that the defendant made no efforts to assist either of his victims and placed their bodies at the rear of the cleaners where they would not be found easily.

For the foregoing reasons, we conclude that each of the cases in which we have found the death penalty to be disproportionate is distinguishable from the present case. In fact, the present case bears little similarity to any of those cases.

In performing our statutory duty of proportionality review, it is also appropriate for us to compare the case before us to other cases in the pool used for proportionality review. *Lawson*, 310 N.C. at 648, 314 S.E.2d at 503.

> If, after making such comparison, we find that juries have consistently returned death sentences in factually similar cases, we will have a strong basis for concluding that the death sentence under review is not excessive or disproportionate. If juries have consistently returned life sentences in factually similar cases, however, we will have a strong basis for concluding that the death sentence in the case under review is disproportionate.

*McCollum*, 334 N.C. at 242, 433 S.E.2d at 163. However, the factors to be considered and their relevance during proportionality review in a given capital case "will be as numerous and as varied as the cases coming before us on appeal." *Williams*, 308 N.C. at 80, 301 S.E.2d at 355. Therefore, the fact that in one or more cases factually similar to the one under review a jury or juries have recommended life imprisonment is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review. Early in the process of developing our methods for proportionality review, we indicated that similarity of cases, no matter how many factors are compared, will not be allowed to "become the last word on the subject of proportionality rather than serving as an initial point of inquiry." *Id.* at 80-81, 301 S.E.2d at 356. Instead, we stated plainly that the constitutional requirement of "individualized consideration" as to proportionality could only be served if the issue of whether the death penalty was disproportionate in a particular case ultimately rested upon the "experienced judgments" of the members of this Court, rather than upon mere numerical comparisons of aggravators, mitigators and other circumstances. Further, the fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have "consistently" returned life sentences in factually similar cases.

STATE v. GREEN

[336 N.C. 142 (1994)]

The defendant in the present case refers us to numerous cases in which juries during capital sentencing proceedings recommended life sentences. The defendant groups those cases into clusters, each of which is composed of cases which tend to share only one of the aggravating or mitigating circumstances found in the present case. None of those cases involved a defendant who committed double robbery murders with regard to which the jury found the same three aggravating circumstances and seven mitigating circumstances found by the jury in the present case. It suffices here to say that we have examined all of the numerous cases cited by the defendant and conclude that each of them is distinguishable from the present case.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we review all of the cases in the pool when engaging in our statutorily mandated duty of proportionality review, we reemphasize here "that we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* "The Bar may safely assume that we are aware of our own opinions filed in capital cases arising since the effective date of our capital punishment statute, 1 June 1977." *Williams*, 308 N.C. at 81-82, 301 S.E.2d at 356. Here, it suffices to say that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have *consistently* returned recommendations of life imprisonment. *E.g., State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985) (double robbery-murder as to which the jury found the aggravating circumstances that the murder was committed for pecuniary gain and that the murder was part of a course of conduct which included the commission by the defendant of another crime of violence against another person—death sentence proportionate); *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308 (1983) (murder where the jury found as aggravating circumstances that the defendant had previously been convicted of a felony involving the use of violence to the person, the murder was part of a course of conduct which included a crime of violence by the defendant against another person, and the murder was especially heinous, atrocious or cruel—death sentence proportionate). After comparing this case carefully with all others in the pool used for

CHARLOTTE-MECKLENBURG HOSPITAL AUTH. v. N.C. INDUSTRIAL COMM.

[336 N.C. 200 (1994)]

proportionality review, we conclude that it falls within the class of first-degree murders in which we have previously upheld the death penalty. For the foregoing reasons, we conclude that the sentences of death entered in the present case are not disproportionate.

Having considered and rejected all of the defendant's assigned errors, we hold that the defendant's capital sentencing proceeding was free of prejudicial error and that the resulting sentences of death were not disproportionate punishment. Therefore, the sentences of death entered against the defendant must be and are left undisturbed.

No error.